## Case No. 5,170.

GAGER v. The A. D. PATCHIN.

[1 Am. Law J. (N. S.) 529.]

District Court, N. D. New York. Jan., 1849.[1]

Eli Cook, for libellant.
George Underwood, for claimant.

CONKLING, District Judge. One of the objections urged against the libellant's right to maintain this action is, that the services for which he claims compensation, having been performed in pursuance of an express agreement between the parties, and for a

---

[1] [Affirmed in Case No. 87.]

stipulated compensation, this is not a case of salvage but a case of contract of which the court has no jurisdiction. In support of this objection, the counsel for the claimant relies upon the similar case of The Mulgrave, 2 Hagg. Adm. 77, in which Lord Stowell pronounced against the action on this ground, observing that it was not a ·case of salvage, but one of contract, and that he could not entertain the question. Lord Stowell did not, of course, intend to say that he could entertain no action arising ex contractu, but only that the case before him not being a case of salvage. he could not entertain it as a case of that character; and not being a case falling within either of the descriptions of contract embraced within the jurisdiction of the court, he could not entertain it as such. It is well known that the only contracts upon which, at the date of this decision, original suits were in fact entertained in the English high court of admiralty were those for seaman's wages and bottomry bonds, although it has always been conceded that the jurisdiction of the court extended to all such contracts as were made on the high seas and were to be there executed. But by a long series of American decisions, terminating with that of New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, the principle is now firmly established ·that the jurisdiction of the American courts of admiralty does not depend on the decisions of the English common law courts, relative to the jurisdiction of the high court of admiralty of England,. but that all contracts in their nature strictly maritime are cognizable in the admiralty. Such, certainly, is the character of this contract; and if the suit had been in personam, the jurisdiction of the court would have been unquestionable. But whether the contract created a lien on the Patchin, and may therefore also be enforced in a suit in rem, is another question not devoid of difficulty.— That a suit in the admiralty for salvage may be maintained in either form, has never been doubted, and this right is moreover expressly recognized and declared by one of the late rules prescribed by the supreme court. If, therefore, the salvor's title to remuneration in ordinary cases may be considered as founded in implied contract, it might, with great apparent force and propriety, be insisted that the remedial right of the salvor could not, in any degree, be impaired by an express contract, entered into before hand, for the mere purpose of fixing the amount of compensation, without any express or clearly implied intention of waiving the right to prosecute in either of the accustomed forms. But suits for salvage have generally been considered—though I confess it has always appeared to me with somewhat questionable propriety—as cases rather of tort than of contract. It would not necessarily follow, therefore, because the maritime law gives a lien in favor of the salvor in a case strictly of salvage, that it also confers one for serv-

ices of the like nature rendered in pursuance of a contract. But it is a general principle of the maritime law, that from contracts made by the master which bind the owner, as all authorized contracts entered into by him on account of his ship do, unless otherwise expressly provided, there results an implied hypothecation of the ship. The master, undoubtedly, has authority to hire the services of others, when necessary, for the preservation of his vessel, and I imagine that such a contract, subject to the revisory power of the court, would constitute a lien on the vessel. It happens, however, in the present instance that the master was also the sole owner of the vessel to which assistance was rendered; and it is insisted that on this account, he incurred no other than a personal responsibility. Admitting the general principle thus asserted, it becomes necessary, nevertheless, to enquire whether the present is a case to which it is properly applicable.·

The contract was originally entered into between the libellant in person and Lewis J. Higby, professing to act as agent for the claimant. It was in writing and is in the following words: "This·article of agreement made this 13th day of June, 1848, between the steamer Albany and the steamer Patch-· in, Capt. H. Whittaker, in which Capt. Gager of the steamer Albany, agrees to do all he can do, to assist said Patchin, now on the· rocks at Racine point, Wisconsin, and to stay with her until discharged by said Capt. Whittaker, and said Albany is to be paid four hundred and fifty dollars per day, and the time to commence four o'clock to-day, said Albany to have the privilege to make harbor in case of storm. H. Whittaker, Per L. J. Higby, agent. Milwaukee, June 13, 1848." The agreement was made at the place where it bears date, a few miles from the place where the Patchin lay, and on ·being soon· afterwards made known to the claimant, was by him assented to. His residence was in Buffalo. in the state of New York. The claimant, it will be observed, is described simply as captain of the Patchin, and there is no allegation in the pleadings, nor any evidence that the libellant had any knowledge of his proprietary interest in the vessel. In the case of The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409, 5 Pet. Cond. R. 631, it was held that although for materials or supplies furnished in a home port, no implied lien in general attaches to the ship, the reasonable presumption being that they were furnished on the credit of the owner, yet that if a vessel comes into her home port, in a foreign guise. and obtains supplies, this principle is applicable to the case, and a lien in favor of the material men arises. "The questions," say the court, "then arise, on what does the privilege of the material men depend? on the state of facts, or on their belief of facts?" The answer given by the court is. that it depends on the latter. "De non apparentibus et non existentibus, cadem est

ratio"; and applying the principle decided in The St. Jago de Cuba to the present case, it would follow that the contract ought to be treated as having been made with the master as such, unless the libellant was bound to show affirmatively his ignorance of the fact, that the claimant was also the owner of the Patchin. But considering that the contract was made at a place remote from the owner's residence, and that the claimant is described in it only as master; and considering also that his ownership is now set up by him for the purpose of exempting his vessel by way of exception from the general rule, I am of opinion that the onus probandi lies upon him to show the libellant's knowledge of such ownership.

In discussing this point, I have thus far conceded that if the libellant had known that the claimant was the owner and had contracted with him as such, no lien would have resulted from the contract. But I infer that the late Mr. Justice Story entertained a different view of the law, and that he supposed it to be in this respect immaterial whether the contract was made with the master or owner. In The Emulous [Case No. 4,480], which was a suit in rem, the vessel was owned in Boston, and having struck on a rock within the waters of that state, one of the sets of salvors contracted to tow her into port for a specific sum agreed upon. The contract, it is true, was made with the master of the schooner, though, as already observed, in the state to which she belonged. But the learned judge in a formal exposition of what he understood to be the law applicable to cases of that nature, seems not to have recognized any distinction between contracts of this description entered into by the master and those made by the owner in person. His language is as follows:

"The court has been asked upon this occasion to lay down some clear and definite rule as to what shall be deemed salvage service, and what shall be deemed a mere common contract for labor and services. I take it to be very clear, that whenever the service has been rendered in saving property on the sea, or wrecked on the coast of the sea, the service is, in the sense of the maritime law, a salvage service. If it has been rendered under circumstances which establish that the parties have voluntarily and without any controlling circumstances on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation, for labor and services quantum meruerunt; in either case it does not alter the nature of the service, as a salvage service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage contract and a salvage compensation. It is true, that contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of public policy as well as upon just views of moral obligation. No system of jurisprudence purporting to be founded upon moral or religious or even rational principles, could tolerate for a moment the doctrine, that a salvor might avail himself of the calamities of others to force upon them a contract, unjust, oppressive or exorbitant, that he might turn the price of safety into the price of ruin; that he might turn an act demanded by Christian and public duty, into a traffic of profit which would outrage human feelings and disgrace human justice."

In The Centurion [Case No. 2,554], the learned judge of the district of Maine cites the case of The Emulous [supra] as in his judgment containing a just exposition of the law of salvage. It is quite "immaterial," he observes, "whether the salvors accidentally fall in with the wreck and volunteer their services, or are called upon by the owners or persons interested in the wreck to aid in saving it. It is the place where the property is situated, and the circumstances of exposure and peril in which it is found, that determine the question whether it is a case of salvage or not." But in a later case,— that of Bearse v. Three Hundred and Forty Pigs of Copper [Case No. 1,193],—which arose in the district of Massachusetts, and was finally decided on appeal at the circuit court, the objection was distinctly taken, that the services having been performed in pursuance of an express contract, no action in rem could be maintained therefor. The contract was made in that case not by the master, but by the proprietors in person, of the property saved; but this circumstance does not seem to have been considered of any importance even by the counsel for the claimants. The objection was that the service, though of a nature which would otherwise have been a salvage service, having been performed by contract, no right accrued from it to the libellants to proceed against the property. The district judge "held that as the respondents had denied in their answer that any contract subsisted between them and the libellants, at the time the property was recovered, which also appeared upon the evidence, the libel was rightly brought against the property, whether the principle contended for by the libellants was correct or not." The conclusion of Mr. Justice Story on the appeal also was, that the particular services in question were not embraced within the contract set up by the claimants, under which other salvage services had been previously performed by the libellants. But he adverts to the question only as one bearing upon the amount of remuneration to be awarded, and seems not to have considered it at all affecting the right of the libellant

to maintain his action in rem. He refers also with apparent approbation, to his observations above cited in the case of The Emulous. The just inference, therefore, appears to be, that he considered all services, which if rendered voluntarily would be salvage services, as not the less so because rendered in pursuance of an agreement for that purpose; and as entitling the salvor to the like remedies, whether rendered in the one form or the other. If the salvor, especially after the performance of the service, should take a bond or receive a bill of exchange or a negotiable promissory note in payment, it may be conceded that his remedy would be limited to a personal action on the security so taken. But there does not appear to be solid reason for denying to the salvor, a lien on the property saved, merely because the salvage service was performed at the request whether of the master or the owner, and under a promise of remuneration, especially as a court of admiralty possesses an unquestionable power to shield the owners of property saved, against extortionate exactions, by reducing an exorbitant reward, promised under the pressure of alarm or distress. My opinion therefore is that this objection is invalid.

It is farther insisted by the counsel for the claimant, that the stipulated services were not faithfully performed, and that they were in fact worthless. I think this objection has not been substantiated. The witnesses for the libellant give a very exact and intelligible account of the services rendered and the means used by the libellant to relieve the Patchin from her highly perilous situation. This evidence in itself considered is entirely satisfactory, and leaves no room for doubt that the libellant did all that he could reasonably be expected to do, for the relief of the Patchin; that he contributed essentially to her rescue. The witnesses on the other side deal in general censures of the libellant's management; but when pressed to specify the particulars in which his misconduct consisted, they are unable to do so. Indeed, all the more important measures resorted to, were dictated by the claimant himself, and his directions appear to have been readily acquiesced in by the libellant. It was insisted also by the counsel for the claimant, that the persons composing the crew of the Albany ought to have been parties to the suit. When, as is commonly the case, salvage is claimed by the crew, as well as by the master and owners of the salvor vessel, and a suit is to be instituted in the admiralty therefor, it is certainly proper that all should join in such suit; and in case where the salvage service was highly meritorious, as, where it required exhausting labor, or was attended by great danger, if the master should designedly institute a suit in behalf of himself or of himself and his owner, alone, in the hope that through the ignorance of the crew, he might secure a large reward to himself at their expense, he would expose himself to just censure; and there may be cases in which it would be the duty of the court to enquire into the reason of the non-joinder of the seamen, and to see that their rights are maintained, unless they choose voluntarily to relinquish them. But in the present case the crew of the salvor vessel were exposed to no extraordinary hardships or personal danger. Their services were rendered chiefly on board their own steamer, and were substantially such as they had contracted to perform; and they probably and perhaps very properly deemed their stipulated wages a sufficient compensation therefor. If they had thought otherwise, it may be supposed that they would have applied to the court for redress, and it is a mistake to suppose that the right of the libellant, as owner and master of the Albany, to prosecute his suit, is prejudiced by their non-joinder in the action.

With respect to the amount of remuneration to be awarded, there are no circumstances attending the case, which demand the jealous scrutiny of the court, into the reasonableness of the stipulated reward. At the time the contract was entered into, the Patchin was in no danger of immediate destruction. The weather was fair and calm; a large number of persons were already engaged in endeavoring to get her off the rocks; steamers were frequently passing very near to the spot where she lay; the terms of the agreement seem to have been deliberately settled, and in order to determine the just measure of compensation, the books of the Albany were resorted to, for the purpose of ascertaining her ordinary earnings, and the amount to be paid was fixed accordingly. The circumstances of the case scarcely admitted of the indulgence of a spirit of rapacity by the libellant, and there is no evidence tending to show that he was actuated by any such spirit. To say nothing of the great value of the Patchin, the Albany herself was a large and valuable steamer. After transferring her numerous passengers to another steamer and refunding their passage money, she was constantly employed not altogether without danger to herself from hidden rocks, in rendering assistance to the Patchin, during four successive days and nights, and during a portion of the time in strenuous efforts, subjecting her to heavy strains to jerk or drag the Patchin from the rocks. For these sacrifices and services, I cannot say that the stipulated sum of $450 a day is an exorbitant or even an unreasonable compensation; and I am satisfied that the duty of the court will be best performed, by simply enforcing the voluntary agreement of the parties. I accordingly award to the libellant the sum of $1,800. deducting the sum of $300 already paid, with interest from the 17th day of June last, when the service was consummated.